**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff,*
*FLSA Collective Plaintiffs,*
*and Class Members*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

JORGE BECERRO, *on behalf of himself,*
*FLSA Collective Plaintiffs, and the Class,*

Plaintiff,

**v.**

MAYU RESTAURANT INC,
d/b/a WARIQUE GARDEN
DREAMTEAM RESTAURANT ASSOCIATES, INC.,
d/b/a WARIQUE
JIMMY LOZANO, and
MARIA PAULINA RODRIGUEZ,

Defendants.

---

Case No:

**CLASS AND COLLECTIVE ACTION COMPLAINT**

Plaintiff, JORGE BECERRO ("Plaintiff"), on behalf of himself and others similarly situated, by and through his undersigned attorneys, hereby files this Class and Collective Action Complaint against Defendants, MAYU RESTAURANT INC, DREAMTEAM RESTAURANT ASSOCIATES, INC. (together the "Corporate Defendants"), JIMMY LOZANO, and MARIA PAULINA RODRIGUEZ (together the "Individual Defendants," together with the Corporate Defendants, the "Defendants"), and states as follows:

## INTRODUCTION

1. Plaintiff alleges, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), that he and similarly situated individuals are entitled to recover from Defendants: (1) unpaid wages, including overtime, due to time-shaving, (2) unpaid wages, including overtime, due to invalid tip credit deductions, (3) unpaid overtime premiums, (4) liquidated damages for unpaid wages and overtime, and (5) attorneys' fees and costs.

2. Plaintiff additionally alleges, pursuant to the New York Labor Law ("NYLL"), that he and similarly situated individuals are entitled to recover from Defendants: (1) unpaid wages, due to time-shaving, (2) unpaid wages, including overtime, due to invalid tip credit deductions, (3) unpaid overtime premiums, (4) unpaid spread of hours premiums, (5) liquidated damages, (6) statutory penalties due to WTPA violations, and (7) attorneys' fees and costs.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this controversy pursuant to 29 U.S.C. §216(b), 28 U.S.C. §§1331, 1337 and 1343, and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

4. Venue is proper in the Eastern District pursuant to 28 U.S.C. §1391.

## PARTIES

5. Plaintiff, for all relevant time periods, was a resident of Queens County, New York.

6. Defendants collectively own and operate a New York City-based business enterprise consisting of two restaurants under the trade name Warique, at the following locations:

(a) "Warique Garden" – 181 Graham Avenue, Brooklyn, NY 11206; and

(b) "Warique" – 90-04 37th Avenue, Jackson Heights, NY 11372.

(collectively, the "Restaurants").

7. Corporate Defendant MAYU RESTAURANT d/b/a Warique Garden, is a domestic business corporation organized under the laws of New York, with a principal place of business and an address for service of process located at 181 Graham Avenue, Brooklyn, NY 11206.

8. Corporate Defendant DREAMTEAM RESTAURANT ASSOCIATES, INC. d/b/a Warique, is a domestic business corporation organized under the laws of New York, with a principal place of business located at 90-04 37th Avenue, Jackson Heights, NY 11372.

9. The two Individual Defendants, JIMMY LOZANO and MARIA PAULINA RODRIGUEZ, are husband and wife.[1] The two Individual Defendants are each an Owner and Principal Member of both Corporate Defendants and Restaurants.[1]

10. At all relevant times, the two Individual Defendants each exercised direct and actual functional control and oversight of the business and financial operations, as well as all other general affairs, of both Corporate Defendants and Restaurants.

11. At all relevant times, the two Individual Defendants each exercised the direct and actual power and authority (and also delegated the power and authority to managers and supervisors) to: (i) hire and fire all employees and Managers of the Restaurants (including Plaintiff, FLSA Collective Plaintiffs, and Class Members), (ii) determine their hourly rates or salaries, frequencies of payments, and means of payments, (iii) establish, alter, or otherwise affect their work schedules, (iv) otherwise directly or indirectly affect the qualities, terms and conditions of their employments, and (v) maintain their employment records.

12. At all relevant times, the two Individual Defendants each ensured that their Restaurants operated efficiently and profitably by frequently visiting their Restaurants to: (i) inspect the operations and quality of food, service, and hygiene of the Restaurants, (ii) meet and

[1] https://culinarybackstreets.com/stories/queens/warique

confer with the Restaurants' management teams to discuss operations, sales, and overall status of the Restaurants and their employees, (iii) pick up or drop off supplies, ingredients, or paperwork, (iv) personally supervise employees (including Plaintiff, FLSA Collective Plaintiffs, and Class Members) and managers and monitor their individual performances of duties and behaviors to ensure they effectively completed their job duties, (v) directly or indirectly reprimand any employees (including Plaintiff, FLSA Collective Plaintiffs, and Class Members) or managers who did not perform their duties sufficiently or correctly, or displayed inappropriate behavior.

13. At all relevant times, Plaintiff, FLSA Collective Plaintiffs, and Class Members had the ability to, and/or actually did, complain to either of the two Individual Defendants (via direct contact during their visits to the Restaurants or by digital communications) directly regarding any of the terms of their employments, and both of the two Individual Defendants would have the actual power and authority to immediately, directly, and actually affect any changes to the qualities and terms of their employments to appease their complaints (including, but not limited to, immediately changing their schedules, compensation, locations, or positions).

14. Although Plaintiff only worked at the Warique Garden location, both Corporate Defendants / Restaurants are still appropriately named in the Complaint because they operate as a single integrated enterprise. Defendants' two Restaurants share: (i) common ownership and management by the Individual Defendants and interchangeable Managers, (ii) interrelation of operations as shown through the Restaurants' sharing of employees, managers, menu, and logo, and (iii) centralized control of labor relations as shown through the exchange of employees and Managers between the two Restaurants.

15. Both Restaurants are engaged in related activities and have a common business purpose. The two Restaurants are commonly based and focused on their Peruvian / Latin

American culture and cuisine. *See* https://www.nytimes.com/2019/07/18/dining/warique-review-queens.html. Additionally, the Restaurants share the same business name "Warique," the same logo and the same menu. *See* **Exhibit A**, screenshots of the menus at Defendants' two locations.

16. At all relevant times, Defendants regularly transferred and interchanged employees and Managers between the Restaurants. The successful operations of the Restaurants over the years adequately relied on Defendants' ability to transfer and interchange employees between the Restaurants.

17. Throughout Plaintiff's employment, Plaintiff personally observed employees (including Gabby [LNU]) and managers (including Jaime [LNU]) interchange between Defendants' two Restaurants.

18. At all relevant times, each of the Corporate Defendants was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA and the NYLL.

19. At all relevant times, the work performed by Plaintiff, FLSA Collective Plaintiffs and Class Members was directly essential to the business operated by Defendants.

## FLSA COLLECTIVE ACTION ALLEGATIONS

20. Plaintiff brings claims for relief as a collective action pursuant to FLSA Section 16(b), 29 U.S.C. § 216(b), on behalf of all non-exempt employees (including Servers, Bussers, Bartenders, Food Runners, Hostesses, Delivery Persons, Line Cooks, Food Preparers, and Dishwashers, among others) employed by Defendants on or after the date that is six years before the filing of the Complaint in this case as defined herein (herein, "FLSA Collective Plaintiffs").

21. At all relevant times, Plaintiff and the other FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices,

procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay Plaintiff and FLSA Collective Plaintiffs their proper wages, including their overtime premiums at one and a half times their regular rates for all hours worked over forty (40) in a workweek, due to Defendants' policies of (i) time-shaving, (ii) invalid tip credit, and (iii) failing to compensate Plaintiff and FLSA Collective Plaintiffs at proper overtime rate.

22. The claims of Plaintiff stated herein are essentially the same as those of the other FLSA Collective Plaintiffs. Plaintiff and a Sub-collective of tipped employees within the FLSA Collective Plaintiffs were additionally subjected to Defendants' failure to pay their proper wages, including overtime premiums, due to Defendants' policy of deducting invalid tip credits from their wages.

23. The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to § 16(b) of the FLSA, 29 U.S.C. 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided to FLSA Collective Plaintiffs via first class mail to the last address known to Defendants.

## RULE 23 CLASS ALLEGATIONS

24. Plaintiff brings claims for relief pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of all non-exempt front-of-house persons (including Servers, Bussers, Bartenders, Food Runners, Hostesses, Delivery Persons, Line Cooks, Food Preparers, and Dishwashers, among others) employed by Defendants on or after the date that is six years before the filing of the Complaint in this case as defined herein (the "Class" or "Class Members").

25. The Class Members are readily ascertainable. The number and identity of the Class Members are determinable from the records of Defendants. The hours assigned and worked, the position held, and rates of pay for each Class Member may also be determinable from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23.

26. The proposed Class is so numerous such that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown because the facts on which the calculation of that number rests presently within the sole control of Defendants, there is no doubt that there are more than forty (40) members of the Class. The Class also includes a subclass of non-exempt tipped front-of-house dining-service staff employees (including Servers, Bartenders, Bussers, and Food Runners, among others) employed by Defendants (the "Subclass" or "Subclass Members"). Plaintiff is a member of both the Class and the Subclass. Further, there is no doubt that there are more than forty (40) members of the Subclass.

27. Plaintiff's claims are typical of those claims that could be alleged by any member of the Class, and the relief sought is typical of the relief, that would be sought by each member of the Class in separate actions. All the Class Members were subjected to the same corporate practices by Defendants, as alleged herein, of Defendants': (1) failure to pay wages and overtime due to time-shaving; (2) failure to pay overtime premiums; (3) failure to pay spread of hours premiums; (4) failure to provide proper wage and hour notices, at dates of hiring and annually thereafter, per requirements of the New York Labor Law; and (5) failure to provide proper wage and hour statements, per requirements of the New York Labor Law. Defendants' corporate-wide

policies and practices affected all Class Members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class Member. Plaintiff and Class Members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices and procedures of Defendants.

28. Additionally, Plaintiff's claims are typical of those claims that could be alleged by any member of the Subclass. In addition to the above, Plaintiff and all Subclass Members were also subject to the same corporate practices of Defendants' failure to pay minimum wages and overtime wages due to a policy of deducting invalid tip credits from their wages.

29. Plaintiff and the Subclass suffered from Defendants' failure to pay minimum wages due to Defendants' invalid tip credit policy because Defendants: (i) failed to properly provide Plaintiff and Subclass Members with tip credit notices as required by NYLL § 195 at their dates of hiring and annually thereafter; (ii) deducted tip credits from Plaintiff's and Subclass Members' wages for all hours worked despite having caused them to engage in non-tipped duties for continuous periods of time exceeding thirty (30) minutes every shift; and (iii) deducted tip credits from Plaintiff's and Subclass Members' wages for weeks where the total amount of non-tip producing work or side work they each performed exceeded 20% or 2 hours of the total work they performed for that week.

30. Plaintiff is able to fairly and adequately protect the interests of the Class and Subclass and has no interests antagonistic to the Class or Subclass. Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

31. A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of the wage and hour litigation

where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because losses, injuries and damages suffered by each of the individual Class Members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

32. Defendants and other employers throughout the state violate the New York Labor Law. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide

class members who are not named in the Complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

33. There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including:

a) Whether Defendants employed Plaintiff and the Class within the meaning of the New York Labor Law;

b) What are and were the policies, practices, programs, procedures, protocols, and plans of Defendants regarding the types of work and labor for which Defendants did not pay Plaintiff and Class Members properly;

c) At what common rate, or rates subject to common methods of calculation, was and are Defendants required to pay Plaintiff and Class Members for their work;

d) Whether Defendants properly notified Plaintiff and the Class Members of their hourly rates and overtime rates;

e) Whether Defendants properly paid Plaintiff and Class Members for all their actual hours worked;

f) Whether Defendants properly provided notice to Plaintiff and Subclass Members that Defendants were deducting tip credits from their wages;

g) Whether Defendants provided proper wage statements informing Plaintiff and Subclass Members of the amount of tip credits deducted from their wages for each payment period, their proper overtime rates of compensation, and other information Defendants were required to provide to them on their wage statements, as provided under the New York Labor Law;

h) Whether Defendants took the proper amount of tip credit allowance from Plaintiff's and Subclass Members' wages under the New York Labor Law;

i) Whether Defendants required Plaintiff and Subclass Members to perform non-tipped work for more than 20% of their workdays;

j) Whether Defendants required Plaintiff and Subclass Members to perform non-tipped work for continuous periods of time exceeding 30 minutes;

k) Whether Defendants paid Plaintiff and Class Members their owed spread of hours premiums;

l) Whether Defendants provided Plaintiff and Class Members with proper wage and hour notices, at their dates of hiring and annually, per requirements of the New York Labor Law;

m) Whether Defendants provided Plaintiff and Class Members with proper wage statements with each payment of wages, as required by New York Labor Law;

n) Whether Defendants paid Plaintiff and Class Members the prevailing New York State minimum wage for all their hours worked; and

o) Whether Defendants properly compensated overtime premiums to Plaintiff and Class Members for their overtime hours worked under New York State law.

## STATEMENT OF FACTS

**Plaintiff's Employment Details**

34. On or around June 26, 2025, Plaintiff was hired by Defendants to work as a Bartender at Defendants' Warique Garden location. Plaintiff's employment with Defendants ended in or around August 2025.

35. Throughout his employment, Plaintiff was scheduled by Defendants to work the following schedule each week:

| Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|
| Off | Off | 4:30 pm to 11:00 pm (6.50 Hours) | 4:30 pm to 11:00 pm (6.50 Hours) | 2:00 pm to 11:00 pm (9 hours) | 11:30 am to 11:00 pm (11.50 Hours) | 11:30 am to 10:30 pm (11 Hours) |

36. In total, Plaintiff was scheduled to work approximately forty-four and half (44.5) hours per week.

37. Throughout the relevant period, FLSA Collective Members and Class Members worked similar amounts of days and hours each week.

38. Throughout his employment, Plaintiff was paid by Defendants at the New York State minimum tipped credit hourly rate of $11.00 per hour. At all relevant times, Defendants paid tipped FLSA Collective Plaintiffs and Subclass Members at similar hourly rates. *See* **Exhibit B**.

**<u>Plaintiff's Timeshaving Claims</u>**

39. At all relevant times, Defendants failed to compensate Plaintiff, FLSA Collective Plaintiffs, and Class Members for all hours they were required by Defendants to work due to policies of timeshaving, in violation of the FLSA and the NYLL.

40. At all relevant times, Defendants did not utilize a time-clock system or any other system to record employees' clock-in and clock-out times. Because Defendants did not record the number of hours that employees had actually worked every day, Defendants only compensated employees for their scheduled hours rather than the number of hours they actually worked.

*(a) <u>Post-Shift Timeshaving</u>*

41. Throughout his employment Plaintiff was required by Defendants to work past the end of his scheduled shifts for an additional thirty (30) minutes every workday. During this time, Plaintiff was required to perform non-tipped sidework / closing duties such as cleaning the bar and tables, sweeping and mopping the floor, cleaning walls and furniture, counting the cash register, filling out end-of-day cash reports, and general cleaning, among others. However, due to Defendants' refusal to compensate hours worked outside of his scheduled hours, Defendants failed to pay Plaintiff for all hours worked after his scheduled shifts.

42. As a result, Plaintiff was not paid for thirty (30) minutes of post-shift work every workday. Because Plaintiff was already always scheduled to work over forty (40) hours each workweek, these unpaid hours every week would be unpaid overtime hours.

43. Defendants similarly required FLSA Collective Plaintiffs and Class Members to perform work after their scheduled shifts had ended and failed to compensate them wages and overtime premiums for such work.

*(b) <u>Intra-Shift Meal Break Timeshaving</u>*

44. Throughout Plaintiff's employment, Defendants never provided Plaintiff with any free and clear meal breaks, and required Plaintiff to work all hours of his shifts. However, Defendants automatically deducted thirty (30) minutes from Plaintiff's wages every workday as if Plaintiff had actually taken a meal break, in order to make it seem as if they were providing Plaintiff with his lawfully-required meal breaks.

45. As a result, Plaintiff was not paid for thirty (30) minutes of intra-shift work every workday. Additionally, because Plaintiff was already always scheduled to work over forty (40) hours each workweek, these unpaid hours would be unpaid overtime hours.

46. Defendants similarly did not provide FLSA Collective Plaintiffs and Class Members with free and clear meal breaks, but automatically deducted 30 minutes from their wages each workday.

47. At all relevant times, Defendants knowingly and willfully operated their business with a policy of timeshaving Plaintiff's, FLSA Collective Plaintiffs', and Class Members' hours worked outside of their scheduled hours, in violation of the FLSA and the NYLL.

**Plaintiff's Unpaid Spread of Hours Premiums Claims**

48. At all relevant times, Defendants failed to pay spread of hours premiums to Plaintiff and Class Members for all their workdays with a spread of ten (10) or more hours, in violation of the FLSA and the NYLL.

49. Throughout his employment, Plaintiff was required to work shifts with a spread of ten or more hours every Saturday and Sunday. Defendants failed to compensate spread of hours premiums for these days. Class Members were similarly required to work over-ten-hour shifts throughout the relevant period. However, Defendants failed to pay Plaintiff and Class Members their owed spread of hours premiums for every workday lasting more than ten (10) hours.

50. At all relevant times, Defendants knowingly and willfully operated their business with a policy of failing to pay spread of hours premiums to Plaintiff and Class Members for each of their workdays lasting ten or more hours, in violation of the NYLL.

**Plaintiff's Invalid Tip Credit Deductions Claims**

51. At all relevant times, Defendants failed to adequately compensate Plaintiff, FLSA Collective Plaintiffs, and Class Members for all hours they were required to work by Defendants, due to Defendants' policy of deducting invalid tip credits from their wages, in violation of the FLSA and the NYLL.

52. Throughout Plaintiff's employment, Defendants deducted a tip credit from Plaintiff's, FLSA Collective Plaintiffs', and Subclass Members' wages, as permitted throughout 2025 by the NYLL.

53. However, Defendants were not actually entitled to deduct any tip credits from Plaintiff's, FLSA Collective Plaintiffs', Subclass Members' wages under the FLSA or the NYLL because Defendants: (i) failed to provide tip credit notice to Plaintiff, FLSA Collective Plaintiff and Subclass Members at their hirings, (ii) deducted tip credits from Plaintiff's, FLSA Collective Plaintiffs' and Subclass Members' wages for all hours worked despite having caused them to engage in non-tipped duties for (a) continuous periods of time exceeding thirty (30) minutes, and (b) more than 20% of the work they performed each week, and (iii) unlawfully retained tips from Plaintiff, FLSA Collective Plaintiffs, and Subclass Members.

54. As a direct result of Defendants' invalid tip credit deduction policy, Plaintiff and Subclass Members were paid below the New York State minimum wage in violation of the NYLL. *See* 12 N.Y.C.R.R. § 146-1.2, *et seq.*

55. Throughout Plaintiff's employment, Defendants required Plaintiff to engage in numerous non-tipped duties such as (i) cleaning, (ii) moving and transferring items, supplies and equipment, and (iii) filling out end-of-day cash reports, among others.

56. As stated earlier, Plaintiff spent a continuous thirty (30) minutes engaging in non-tipped closing duties at the end of every workday. Additionally, Plaintiff spent another two (2) to three (3) hours every shift doing additional non-tipped side work. Because Plaintiff's shifts were 6.50 to 11.50 hours long, Plaintiff's non-tipped side work took more than 20% of Plaintiff's hours worked. Such excessive non-tipped side work is sufficient to invalidate Defendants' tip credit deductions.

57. Additionally, Defendants were not entitled to deduct tip credits from tipped FLSA Collective Plaintiffs' and Subclass Members' wages, as they required FLSA Collective Plaintiff and Subclass Members to engage in similar non-tipped duties for similar amounts of time.

58. Further, Plaintiff and Subclass Members never received any notices from Defendants that Defendants were claiming a tip credit on their weekly compensation. They were never told by Defendants that Defendants were deducting tip credits from their wages nor did they ever receive proper notice by Defendants as to the amount of tip credit allowances Defendants deducted for each payment period during their employments. *See* **Exhibit B**.

**Plaintiff's Unpaid Overtime Premiums Claim**

59. At all relevant times, Defendants failed to properly compensate Plaintiff, FLSA Collective Plaintiffs, and Class Members for all their worked hours over 40 hours per workweek, due to Defendants' policy of failing to pay proper overtime rates, in violation of the FLSA and the NYLL.

60. Throughout Plaintiff's employment, Defendants arbitrarily compensated Plaintiff's overtime wages at either his regular hourly wage rate or at a separate but improper overtime wage rate of $16.50 per hour.

61. Throughout Plaintiff's employment, the prevailing 2025 New York State minimum wage rate was $16.50 per hour. Accordingly, the minimum overtime wage rate during this time was $24.75 ($16.50 x 1.50) per hour.

62. The FLSA and NYLL both require employers to calculate tipped employees' overtime payrates by multiplying their regular hourly wage rates by 1.50, **before** deducting any tip credits, and then deducting any tip credits from said multiplied rate. *See* 29 C.F.R. § 531.60; 12 N.Y.C.R.R. § 146-1.4. However, when Defendants paid Plaintiff and other tipped employees

a separate overtime rate, Defendants would deduct their tip credits from their regular wage rate **before** multiplying their payrates by 1.50, causing them to earn significantly less overtime pay than they were owed.

63. For example, Plaintiff's minimum wage rate during his employment was $16.50 per hour, and his tip credit payrate was $11.00 per hour with a tip credit of $5.50 per hour. According to the FLSA and NYLL, Plaintiff's overtime pay rate should have been $19.25 (($16.50 x 1.50) - $5.50). Instead, Defendants would compensate Plaintiff's overtime hours at $16.50 per hour ($16.50 - $5.50) x 1.50). *See* **Exhibit B** (copies of Plaintiff's paystubs), pg. 2.

64. Additionally, Defendants did not provide Plaintiff with any separate overtime payrate at all for some workweeks and would instead compensate his overtime hours at his regular tip credit hourly wage rate of $11.00 per hour during these workweeks. *See* **Exhibit B**, pg. 1.

65. At all relevant times, Defendants similarly failed to pay FLSA Collective Plaintiffs and Class Members the full amount of their properly owed overtime pay, and instead compensated their overtime hours at either improperly calculated overtime payrates or their regular hourly payrate.

66. At all relevant times, Defendants knowingly and willfully operated their business with a policy of failing to pay Plaintiff, FLSA Collective Plaintiffs and Class Members the full amount of their properly owed overtime premium pay, in violation of the FLSA and the NYLL.

**Plaintiff's WTPA Violation Claims**

67. At all relevant times, Plaintiff and Class Members never received wage notices or accurate wage statements from Defendants, in violation of the NYLL.

68. In violation of the Wage Theft Protection Act ("WTPA")—incorporated into NYLL—Defendants knowingly and willfully operated their business with a policy of not providing wage notices to Plaintiff and Class Members at the beginning of their employment with Defendants.

69. Defendants' wage statements violated the WTPA, because wage statements that do not reflect the actual number of hours worked by the employee do not satisfy the requirements of the WTPA. *See Shi Yong Li v. 6688 Corp.*, 2013 U.S. Dist. LEXIS 148020, at *6 (S.D.N.Y. Sept. 27, 2013) ("The wage statements provided failed to accurately indicate the amount of time actually worked by tipped employees") (emphasis added); *Copper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460, 468 (E.D.N.Y. 2015) (holding that "the 'number of overtime hours' that appears on the wage statement should include every hour actually 'worked' by the employee") (emphasis added); *Campos v. Bkuk 3 Corp.*, 2021 U.S. Dist. LEXIS 151528, at *30 (S.D.N.Y. Aug. 10, 2021) ("Thus, when paystubs were received, they were not accurate insofar as they did not accurately reflect the hours actually worked") (emphasis added). Here, Defendants' wage statements did not reflect the actual amount of hours that Plaintiff and Class Members worked, and instead reflected the amount of hours Defendants paid them for after Defendants timeshaved hours from their wages every workday.

70. In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that entails a concrete harm to an interest identified by the New York State legislature. As one Court observed:

> Here, Plaintiffs allege that Defendants failed to furnish them with proper wage notices and statements, as required by NYLL §§ 195(1) and 195(3). These provisions were enacted as part of New York's Wage Theft Prevention Act ("WTPA"), N.Y. Lab. Law § 195, which sought "to expand the rights of employees to seek civil and criminal avenues of remedy for their employers failing to follow labor law appropriately and the specifications therein." N.Y.

> Spons. Mem., 2010 S.B. 8380. More specifically, the New York State Assembly passed the WTPA to address studies showing that a large number of employees were not being paid the wages owed to them, and that many employers were not adequately informing their employees of their wages and how they are calculated in language the employees could understand. *Id.* The New York State Assembly opined that existing penalties did not adequately deter employers from paying less than the wages owed, and stated that the WTPA would dramatically change this by increasing penalties for violating employees' rights. *Id.*

*Imbarrato v. Banta Mgmt. Servs.*, 2020 U.S. Dist. LEXIS 49740, at *21-22 (S.D.N.Y. March 20, 2020)

71. Here, Defendants' failure goes beyond generating a risk of harm to Plaintiff and Class Members. Defendants' conduct actually harmed Plaintiff and Class Members. Defendants' failure to provide wage notices and paystubs listing all hours actually worked and rates of pay, including overtime hours and overtime rates, deprived employees of the ability to contest the pay provided by Defendants, allowed Defendants to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiff's and Class Members' rights. This conduct ensured Defendants' ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Defendants' failure to provide wage notices and wage statements to employees allowed Defendants to hide their responsibility and deprive employees of timely compensation.

72. Had the wage statements Defendants provided to Plaintiff and Class Members accurately listed the total number of hours Plaintiff and Class Members actually worked, as required by law, Defendants would have had to either (a) increase the wages to correspond to the hours actually worked or (b) forthrightly acknowledge, by way of the wage statement, that the employee's wages did *not* correspond to the hours the employee actually worked. Either possibility would have allowed Plaintiff and Class Members to vindicate their rights under the NYLL. The deprivation of these possibilities therefore constitutes an injury.

73. The failure to provide proper wage notices and wage statements continues to result in delayed payment of all proper wages owed to Plaintiff and Class Members. This delayed payment caused Plaintiff and Class Members to struggle to pay bills and other debts.

74. Defendants knowingly and willfully operated their business with a policy of not providing proper wage notices and wage statements as required by NYLL.

75. The direct effect of understating the number of hours an employee worked is to reduce the wages that employees are listed as having earned on their wage statements. The direct effect of this, in turn, is to reduce the employee earnings that the employer later reports to the IRS through the employee's W-2 form, as such information is derived from the information on employees' wage statements. *See Mills v. Mills*, 2021 Minn. Dist. LEXIS 200, at *5 (Minn. Dist. Ct., Anoka County, Tenth Judicial District May 20, 2021) ("Petitioner's gross annual income, based on her 2020 W-21 and paystub dated 12/24/20, is $130,321.30"); *T.F. v. N.F.*, 820 N.Y.S.2d 846, 846 (Sup. Ct., Suffolk Cty., June 22, 2006) ("In 2005 the plaintiff earned $ 133,086 as reflected on his final year paystub and W-2").[2]

76. The effect of reporting reduced wages on an employees' W-2 is, in turn, to reduce the amount of social security benefits available to the employee, as an employee's entitlement to benefits reflects how much money he or she is reported as having contributed to the social security system. *See McGauran v. Soc. Sec. Comm'n*, 2001 U.S. Dist. LEXIS 3187, at *7 (N.D. Cal. March 19, 2001) ("Social security benefits are based upon the worker's earnings as reported

[2] It is true that the wages reported on W-2 forms are not always precisely identical to those listed on an employees' last paystub for the year. One reason for is, as the IRS explains, that "W-2 wages include: (i) the total amount of wages as defined in section 3401(a); (ii) the total amount of elective deferrals (within the meaning of section 402(g)(3)); (iii) the compensation deferred under section 457; and (iv) the amount of designated Roth contributions (as defined in section 402A)." https://www.irs.gov/pub/irs-drop/rp-19-11.pdf. However, the possibility, that wages listed on a W-2 might be affected by such considerations does not change the fact that the base wages on the W-2 are derived from paystubs. The paystub processing service *realcheckstubs* explains: "A pay stub contains crucial information that assists in calculating W2 wages. Paystub provides gross wages, deductions, taxes withheld, and other income-related data. Individuals gather the necessary figures required for accurate W2 calculation by referring to the pay stub." https://www.realcheckstubs.com/blog/paystubs/6-steps-how-to-calculate-w-2-wages-from-paystub.

to the [SSA] . . . [and] the worker's earnings are used to determine insured status for entitlement to retirement and to calculate cash benefit rates." (quoting Social Security Administration, Handbook § 1400 (1997)); *Coward v. Zurich Am. Ins. Co.*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) ("Under the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year.'") (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

77. "In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation." *Chen v. Lilis 200 W. 57th Corp.*, 2023 U.S. Dist. LEXIS 38163, at *18 (S.D.N.Y. Mar. 7, 2023). "On the other hand, 'allegations' that go 'beyond asserting a bare statutory violation and sufficiently allege concrete harm' resulting from 'the underpayment of wages' pass muster because 'monetary injury is a concrete harm sufficient for purposes of Article III standing.'" *Thompson v. Elev8 Ctr. N.Y., LLC*, 2023 U.S. Dist. LEXIS 122504, at *21 (S.D.N.Y. July 17, 2023) (quoting *Mateer v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 125017, at *4 (S.D.N.Y. July 14, 2022)).

78. Here, it is clear that Defendants' failure to provide Plaintiff and Class Members with accurate wage statements entailed "concrete, downstream consequences" involving monetary injury. Had the number of hours been accurately reported for a given pay period, Defendants' automatic payroll system would have correspondingly increased the wages due for that period—albeit still calculated at the incorrect rate—which in turn would have been reflected in the W-2s that Defendants submitted to the IRS on behalf of Plaintiff and Class Members. That, in turn, would have increased Plaintiff's and Class Members' entitlement to social security

benefits. Because the inaccuracy prevented this outcome, it constitutes an injury sufficient to provide Plaintiff with Article III standing.

79. Courts agree that the misreporting of wages constitutes a concrete injury cognizable under Article III:

> The Seventh Circuit in *Calderon* squarely addressed FICA standing. The plaintiffs in *Calderon* were former employees alleging the employer failed to pay their FICA taxes. 999 F.2d at 1105-06. The Seventh Circuit found that the plaintiffs lacked standing to compel the employer to pay their FICA taxes because "[b]enefits do not. . . depend on whether the employer actually paid the taxes." *Id.* at 1106. Plaintiffs could, however, enforce FICA's reporting requirement because it is the reporting of income that triggers benefits, and losing benefits is an injury under *Lujan*. *Id*. Whether the employer in *Calderon* made FICA payments on the plaintiffs' behalf had no bearing on the plaintiffs' entitlement to benefits. *Id.* "[T]he plaintiff's real interest lies in ensuring that the [employer] make the proper reports of their income." *Id.*

*Coward*, 2011 U.S. Dist. LEXIS 74543, at *3-4.

80. The case at bar is somewhat different from *Coward* inasmuch as Defendants actually underpaid Plaintiff and other employees rather than merely misreporting their income. But this distinction has no bearing on the question of Article III standing, since it is still the case that "it is the reporting of income that triggers benefits, and losing benefits is an injury." *Id.* Plaintiff and Class Members lost benefits by virtue of how Defendants reported their income, and how Defendants reported employees' income was the direct outcome of the inaccuracies in employees' wage statements. That is why "Plaintiffs have standing to enforce the statutory reporting requirements" imposed by the WTPA. *Calderon v. Witvoet*, 999 F.2d 1101, 1106 (7th Cir. 1993).

81. Whether or not any Class Members are presently eligible for social security benefits is legally immaterial. *See id.* ("Although only citizens and aliens residing in the United

States may receive benefits, 42 U.S.C. § 402(t), plaintiffs may eventually fulfill this requirement and therefore are entitled to keep their Social Security accounts accurate.”).

82. The *Calderon* court stressed that an employee’s interest in ensuring that an employer properly report the employee’s income is amplified by the difficulty of persuading the government to correct errors:

> The practical difficulty is that eligibility for Social Security benefits presumptively depends on reports that employers send to the government. A worker who seeks credit for unreported income bears the burden of proof, 42 U.S.C. § 405(c)(3), (4), which will be hard to carry if the employer has not furnished the customary documentation. The government believes employers who report earnings, because these reports are costly to make--they entail paying a substantial tax. The government tends not to believe undocumented claims by employees, because these claims are essentially costless yet could establish entitlement to large pensions or disability benefits.
>
> All of this means that the plaintiffs' real interest lies in ensuring that the Witvoets make the proper reports of their income.

*Id.*

83. Here, the problem is not merely challenging but insurmountable. Plaintiff and Class Members cannot even attempt to have their earnings report corrected because Defendants *did* report what they actually paid Plaintiff and Class Members. The problem, rather, is that Plaintiff and Class Members were underpaid. Yet the ultimate effect is the same—reduced social security eligibility. Because “[u]nder the Social Security statute, entitlement depends on ‘the total of the wages paid . . . to an individual in a calendar year,’” Plaintiff was irreversibly injured with respect to his social security benefits as soon as Defendants sent his W-2 to the IRS. *Coward*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

84. Defendants knowingly and willfully operated their business with a policy of failing to provide Plaintiff and Class Members with wage notices and accurate wage statements, in violation of the NYLL.

85. Plaintiff retained Lee Litigation Group, PLLC to represent Plaintiff, FLSA Collective Plaintiffs, and Class Members in this litigation, and has agreed to pay the firm a reasonable fee for its services.

**STATEMENT OF CLAIM**

**COUNT I**

**VIOLATIONS OF THE FAIR LABOR STANDARDS ACT**

86. Plaintiff realleges and incorporates all the above allegations of this Complaint as fully set forth herein.

87. At all relevant times, Defendants were and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiff and FLSA Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207 (a).

88. At all relevant times, Defendants employed Plaintiff and FLSA Collective Plaintiffs within the meaning of the FLSA.

89. At all relevant times, each of the Corporate Defendants had gross annual revenues in excess of $500,000.

90. At all relevant times, Defendants had a policy and practice that failed to pay Plaintiff and FLSA Collective Plaintiffs their wages, including overtime, due to time-shaving.

91. At all relevant times, Defendants had a policy and practice that failed to pay Plaintiff and FLSA Collective Plaintiffs their proper wages, including overtime, due to a policy of deducting invalid tip credits.

92. At all relevant times, Defendants had a policy and practice that failed to pay Plaintiff and FLSA Collective Plaintiffs their proper overtime premiums for all hours worked over forty (40) hours per workweek.

93. Records, if any, concerning the number of hours worked by Plaintiff and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiff and FLSA Collective Plaintiffs should be in the possession and custody of the Defendants. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due.

94. Defendants knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiff and FLSA Collective Plaintiffs their proper wages, including their proper wages and overtime premiums, when Defendants knew or should have known such was due.

95. Defendants failed to properly disclose or apprise Plaintiff and FLSA Collective Plaintiffs of their rights under the FLSA.

96. As a direct and proximate result of Defendants' willful disregard of the FLSA, Plaintiff and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

97. Due to the intentional, willful, and unlawful acts of Defendants, Plaintiff suffered damages in an amount not presently ascertainable of unpaid wages, overtime wages, and liquidated damages.

98. Plaintiff and FLSA Collective Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs pursuant to 29 U.S.C. §216(b).

## COUNT II

## VIOLATIONS OF THE NEW YORK LABOR LAW

99. Plaintiff realleges and incorporates all the above allegations of this Complaint as fully set forth herein.

100. At all relevant times, Plaintiff and Class Members were employed by the Defendants within the meaning of the New York Labor Law, §§2 and 651.

101. Defendants willfully violated Plaintiff's and Class Members' rights by subjecting them to a policy of timeshaving.

102. Defendants willfully violated Plaintiff's and Class Members' rights by failing to pay them any spread of hour premiums for all their shifts worked in excess of ten (10) hours.

103. Defendants willfully violated Plaintiff's and Class Members' rights by failing to pay them their proper overtime premiums for all hours worked over 40 hours per workweek.

104. Defendants failed to properly notify employees of their hourly pay rates and overtime rates, in direct violation of the New York Labor Law.

105. Defendants willfully violated Plaintiff's and Subclass Members' rights by failing to pay them the lawful minimum wage for all hours worked. As factually described above, Defendants were not entitled to claim any tip credits from Plaintiff's and Subclass Members' wages under the NYLL.

106. Defendants willfully violated Plaintiff's and Subclass Members' rights by subjecting them to an improper policy and practice in which they were required to engage in

non-tipped work for: (i) continuous periods of time exceeding 30 minutes; or (ii) more than 2 hours or 20% of each of their workweeks.

107. Defendants failed to provide Plaintiff and Class Members with proper wage and hour notices, at their dates of hiring and annually, per requirements of the New York Labor Law.

108. Defendants failed to provide Plaintiff and Class Members with proper wage statements with every payment as required by New York Labor Law § 195(3).

109. Due to the Defendants' New York Labor Law violations, Plaintiff and Class Members are entitled to recover from Defendants their unpaid minimum wages, unpaid overtime wages, unpaid spread of hours premiums, reasonable attorneys' fees, liquidated damages, statutory penalties, and costs and disbursements of this action, pursuant to New York Labor Law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself, FLSA Collective Plaintiffs, and Class Members, respectfully requests that this Court grant the following relief:

a. A declaratory judgment that the practices complained of herein are unlawful under the FLSA, the NYLL, the NYSHRL, and the NYCHRL;

b. An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

c. An award of unpaid wages and overtime as a result of Defendants' invalid tip credit deductions, due under the FLSA and the NYLL;

d. An award of unpaid wages and overtime as a result of Defendants' policy of timeshaving, due under the FLSA and the NYLL;

e. An award of unpaid overtime premiums as a result of Defendants' policy of failing to compensate proper overtime premium rates, due under the FLSA and the NYLL;

f. An award of unpaid spread of hours premiums, due under the NYLL;

g. An award of statutory penalties as a result of Defendants' failure to comply with the New York Labor Law's wage notice and wage statement requirements;

h. An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay wages pursuant to 29 U.S.C. § 216;

i. An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay wages pursuant to the NYLL;

j. An award of pre-judgment and post-judgment interests, costs, and expenses of this action together with reasonable attorneys' and experts' fees and statutory penalties;

k. Designation of Plaintiff as Representative of the FLSA Collective Plaintiffs;

l. Designation of this action as a class action pursuant to F.R.C.P. 23;

m. Designation of Plaintiff as Representative of Class; and

n. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated: December 5, 2025
New York, New York

Respectfully submitted,

**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181

*Attorneys for Plaintiff,*
*FLSA Collective Plaintiffs,*
*and the Class*

By: /s/ *C.K. Lee*
C.K. Lee, Esq.